[668 NYS2d 5]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JOVANI
GARCIA, Respondent.

First Department, January 6, 1998

## APPEARANCES OF COUNSEL

*Elliot Felig* of counsel *(Carol A. Remer-Smith* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for appellant.

No appearance for respondent.

### OPINION OF THE COURT

Tom, J.

The People appeal from an order of the trial court that granted defendant's motion to set aside the jury verdict convicting defendant of robbery in the first degree and burglary in the first degree based on legal insufficiency of evidence pursuant to CPL 330.30.

At trial, Myriam Cubi, who was 13 years old at the time of the crime and 14 years old at time of trial, testified that she lived on the fifth floor of West 161st Street with her parents, three sisters (one of whom was a baby), and her "uncle" Mario Naula, who was really a close family friend. On Sunday morning, November 27, 1994, on her way to the 9 o'clock morning Mass with her parents, she noticed that she had left a document in the apartment needed for her impending Confirmation. Myriam returned to the apartment as her mother waited downstairs. As she left the apartment after retrieving the document, she noticed defendant exiting the apartment next door. Defendant "ran" toward the stairs and she, conscious of being late and concerned that her parents might leave without her, quickly descended the staircase behind him. On the third floor, Myriam tried to pass defendant, but defendant was standing with his arm outstretched to the wall, blocking her egress. She said "excuse me" a couple of times before he removed his arm. As she passed him and entered onto the landing, she heard him call "little girl" in English. As she turned, she saw that defendant was extracting a gun from his waist, which he then pointed at her head. Although she had never seen a gun before and did not know what to call its components, she described it in detail.

Defendant grabbed her coat, giving her a chance to stare at him face to face. She described him as wearing a knee-length green "puffy" jacket with a green hood, which appeared to be a down jacket. When he extracted the gun from the waistband, the top of blue boxer shorts seemed to rise above his waist. Although defense counsel tried to recharacterize her racial description of him as white, she testified that he appeared to be a light-skinned Hispanic, possibly Puerto Rican or Dominican—she observed that he was lighter skinned than she was—and "if you look to him real close, you'll see that he had like freckles." He had a thin face and no facial hair. She compared him to a particular juror, indicating that defendant was darker than the juror. He was approximately 17 to 22 years old, but youngish looking. When he spoke to her, he spoke in apparently unaccented English; she did not recall him speaking Spanish in her presence. Myriam identified defendant as the perpetrator in the courtroom.

Defendant told her not to scream and asked who was in her home. Fearing for her sisters, she said "nobody." He directed her back upstairs to her apartment and commanded her to knock as he concealed himself near the door. When she identified herself, Naula opened the door; she then ran into the inside hallway, followed by defendant. Defendant pointed the gun at Naula and then struck him twice on the head with the gun. Myriam kept running to the bedroom, warning her sisters in the living room as she passed. She grabbed sheets and pillows under which she concealed her baby sister in the corner of her bed and then told her two other younger sisters to stay in the bedroom and not to say anything. She re-entered the hallway and saw defendant approaching, pushing Naula forward at gunpoint. She noticed that defendant was taller than Naula, whose head was below defendant's chin.

Defendant was talking to Naula in English, which Naula, who is Spanish-speaking, seemed to have trouble understanding. Defendant then directed Myriam, who is bilingual, to tell Naula to lay on the floor, which she conveyed, and with which he complied. Defendant ripped a phone cord to tie up Naula's hands and, with a belt, tied Naula's feet. He then accompanied her into Naula's room and demanded money. While they were going through drawers, Myriam found a wad of currency that she recalled consisted of several $20 bills and maybe one $50 bill, which she gave to defendant saying "here, but leave, leave." Defendant also took items of jewelry, which she specified. Defendant then told her to take off her clothes. She asked

why, and then very slowly started taking off her sneakers, which resulted in defendant hitting her on the side of the face with the gun. When she took off her pants, she again asked why. He explained that it was a means of preventing her from following him. By this time, Naula had hidden in the girls' bedroom. Defendant put the gun to Myriam's head, she heard a click, and defendant told her to tell Naula to come out or he would kill her. She conveyed the message.

However, Naula and a sister had escaped out a window and down the fire escape. Defendant pointed the gun at the other sister, and Myriam heard it click again. Defendant said that they all were going to die. He asked where the baby was, and Myriam, who could see the concealed baby's eyes, said that there was no baby. Defendant started cursing and running around the apartment. When he momentarily stepped outside the door, she pushed it closed and locked it and locked the fire escape window. She called 911, then the church where her parents were and then 911 again. Uniformed officers as well as detectives responded. The entire incident lasted about a half hour.

Defense counsel elicited on cross-examination that the day after the crime, Myriam was taken to the Catch Unit, where she viewed stacks of photos. She selected two photos, each a photo of defendant, and indicated that she was about 90% sure that it was the robber. On redirect, the prosecutor elicited that each photo also seemed different: in the first photo, defendant seemed darker, but it was explained to her that it was taken during the summer and that he was suntanned; the second photo was taken at a different time, and although the subject was lighter than in the first photo, he still seemed darker than the robber; it was explained to her that the background light in which a photo is taken can affect the appearance of skin tone.

Myriam saw defendant again on New Year's Eve standing in front of her building with companions. She described what he was doing. He did not appear to have facial hair. Although she was with her parents, she did not immediately tell them that defendant was the robber; rather, she just ran for the intercom, and then from an interior window, she took another look at him. Waiting until the rest of her family were inside the building, she told her mother, who said that Myriam should tell a Detective Blunt. She was still very afraid of defendant, and so did not pursue the matter. She saw him again during the first week of January. Again, she was with her parents and sisters,

but her parents momentarily entered a store, leaving Myriam, who was still afraid, with her sisters. Defendant was in the company of two other men standing in front of a building across the street. She stared at him several times, and, upon entering the apartment, looked again from her window to assure herself that it was the robber. She asked her sister to look, and her sister agreed that "that's him." When her mother arrived at the window, she again told Myriam to tell Detective Blunt. Again, Myriam did not call. Again, she was afraid, but was positive of her identification.

The next time she saw defendant was in the January 11th lineup, where she made a positive identification. She did not recall whether he had facial hair at that time.

Mario Naula's testimony corroborated Myriam's in relevant detail. He estimated the robber's age to be about 20 to 22 years old, and that his complexion was lighter than his. The robber was Hispanic, likely Puerto Rican or Dominican, who generally spoke in English, but also said words in Spanish. On January 11, Naula viewed a lineup containing defendant. He initially declined to make an identification out of fear and even indicated that he had not recognized anyone in the lineup. However, a detective immediately told him that he should not be afraid, after which Naula identified defendant.

Detective Blunt, who responded to the crime scene, arrested defendant on January 11, 1995, more than a month after Myriam selected his photo. When he was arrested, defendant, although initially asking "what," appeared not to speak English. Blunt further testified that when Myriam first viewed the lineup, she became upset and ran from the room. Detective Luis Castillo testified that Naula was calm walking into the lineup, but upon viewing, he lost color and became visibly scared, shaking and sweating. After Naula walked out without making an identification, Naula volunteered that he was very afraid. Castillo told him to calm down, after which Naula made the identification.

Defendant presented no evidence. The court denied defendant's motion for a trial order of dismissal.

During summation, defense counsel focused the jury on the putative linguistic discrepancies, arguing that the robber did not speak Spanish, and that defendant spoke only Spanish and could not speak English. Defendant used the services of a Spanish translator for the course of the trial. Counsel argued that it was preposterous to conclude that, in perpetrating the robbery, defendant made efforts to disguise a fluency in Spanish, and

that in court he could successfully maintain a charade that he could not understand English. Counsel also argued that Myriam had identified the robber as white and freckled—which is a mischaracterization of her testimony—and that defendant's facial hair in the arrest photo is inconsistent with her ostensible observation of the clean-shaven robber just days before.

After the jury rendered a guilty verdict convicting defendant of the aforementioned crimes, defendant moved to set aside the verdict pursuant to CPL 330.30, arguing that the verdict was not supported by the evidence.

Prior to the date of sentencing, the court, unable to "escape the disturbing conclusion" of misidentification, granted defendant's motion to set aside the verdict. The court concluded that, even viewing the evidence in a light most favorable to the prosecution, no rational trier of fact could have convicted. The court focused on three items of Myriam's testimony: that the perpetrator had freckles; had no facial hair; and appeared to know no Spanish and spoke only English, despite Myriam's belief that he was Puerto Rican or Dominican.

The court found the descriptive details given to the police to be too general and lacking in distinctive features except for those just noted, which the court found to be inconsistent with defendant's courtroom appearance. The court also found Myriam's identification in the photo selection to have been only equivocal, found the family's failure to contact police after subsequent observations of defendant to raise questions as to Myriam's certainty in recognizing the perpetrator and excluded the possibility that defendant could have grown facial hair between Myriam's second, January, observation of him and his arrest the following week. The court also found suspicious that only a "perfunctory and inconclusive" inquiry was made of the neighbor from whose apartment defendant had exited. The court also found the circumstances of the lineup involving Naula to have been suspicious. To this extent, the court found the verdict to have been against the weight of the evidence.

However, the apparent discrepancy in the evidence concerning the respective linguistic abilities of the perpetrator and defendant was the basis upon which the court found the verdict to have been irrational. The court made the observation that when he was asked to stand so that the jury could ascertain his height, defendant did not respond until the request was interpreted. The court also observed that defendant used the

services of an interpreter who spoke to him in Spanish throughout trial, which the court found to be inconsistent with Myriam's impression that the perpetrator did not know Spanish.

Although the trial court characterized its decision as one resting on principles of law, so as to evade the bar imposed by CPL 330.30 (1), the decision clearly is a factual review in which the court, weighing various strands of the evidence, found inconsistencies and found the explanations thereto lacking. As such, the ruling setting aside the verdict based on a factual analysis is procedurally flawed and, on that basis alone, we would reverse for reasons noted *infra*. However, in our independent review of the record, including the defendant's arrest photo, without overlooking that this was an experienced and respected Justice, we also disagree with the trial court's factual recitation as well as its conclusions derived therefrom.

CPL 330.30 (1) allows a court to set aside or modify the verdict if there is an error which, if raised on appeal from a prospective judgment of conviction, would require reversal or modification of the judgment as a matter of law by an appellate court (*People v Colon*, 65 NY2d 888, 890; *People v Echevarria*, 233 AD2d 200, *lv denied* 89 NY2d 942; *People v Carthrens*, 171 AD2d 387, 392). The power given to the Trial Judge under CPL 330.30 (1) is " 'normally limited to a determination that the trial evidence was not legally sufficient to establish the defendant's guilt of an offense of which he was convicted' " (*People v Echevarria, supra*, at 202, quoting *People v Carter*, 63 NY2d 530, 536). In determining whether the jury verdict is supported by legally sufficient evidence, the court, viewing the evidence in a light most favorable to the People, must determine " 'whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial' " (*People v Echevarria, supra*, at 202, quoting *People v Bleakley*, 69 NY2d 490, 495). We have found legal insufficiency predicated on witness testimony to result only when that testimony is found to be so unworthy of belief as to be incredible as a matter of law (*People v Carthrens, supra*).

While we, as an appellate tribunal, have the power to review the factual record to determine whether a verdict is supported by the weight of the evidence, it is well settled that trial courts sitting with juries, acting as judges of law but not facts, are not empowered under CPL 330.30 to vacate a verdict on the basis of their own assessment of the facts or the weight of the evi-

dence (*People v Goodfriend*, 64 NY2d 695, 697; *People v Echevarria, supra*). The trial court essentially found Myriam's testimony to be inconclusive on some points, and inconsistent with the testimony of other witnesses on other points, which, quintessentially, is a weight of the evidence review and not a legal insufficiency determination. Hence, the court was procedurally barred from setting aside this verdict of guilt.

However, even if the trial court had statutory authority, we would have rejected its characterization of certain key facts as well as its conclusions. Initially, although the trial court found putative flaws in the evidence, it did not discredit the veracity of the critical People's witnesses, especially Myriam. In our review of that testimony, we find the young witness to have been remarkably credible based on her ability to make sharp observations and to recall in detail the sequence and nuances of events with significant clarity and persuasive force. Her testimony, which was not shaken under cross-examination, also portrays a child of sound judgment and fortitude. That appearance was not dispelled even by defendant's summation argument. This witness had the opportunity to observe defendant for a half hour under bright lighting conditions during the course of the incident. To the extent that there may have been occasional inconsistencies, the jury had the opportunity to evaluate the over-all effect, and it obviously found the inconsistencies to have been adequately explained or else not so remarkable as to warrant rejection of her testimony. That result accords with our own conclusions.

In this regard, 12 jurors heard the same evidence as the trial court, observed the same witnesses, had opportunities to observe those witnesses' demeanor and their observational and retention abilities, and were presented with counsel's able summation arguments underscoring the same evidentiary inconsistencies upon which the trial court itself relied. We find no discernible basis arising from this evidence to reject the jury's conclusions in favor of those of the trial court.

Further, the trial court initially denied defendant's motion for a trial order of dismissal at the close of evidence. This leads us to conclude that the court, initially unswayed by the evidence, may have been persuaded only by counsel's argument. Moreover, in some regards the court stated concerns that were addressable by matters in the record, or else they were dehors the record. While, at first glance, one might wonder how to reconcile the putative linguistic inconsistencies in the evidence, there is a reasonable view of the evidence that defendant did

know English. Lisa Fonseca was an interviewer for the New York City Criminal Justice Agency, although she was identified to the jury as working only for an unidentified City agency. She had interviewed defendant in connection with this case and filed a report. She testified for the purpose of demonstrating that defendant had been interviewed in, and had demonstrated a command of, English. While Ms. Fonseca had no independent recollection of defendant, she testified that the form that she utilized during interviews required specification whether she conducted the interview in English or in another language. If she had checked "other" it would record that an interpreter had to be used, and the language employed would be indicated in the form's "miscellaneous" section. She checked the box indicating "English." She testified that although it might be possible for her to record mistaken information about pedigree particulars, such as when she mishears an address, she has never made a mistake, and likely could not, in recording that the interview was conducted in English. Fonseca could not speak any Spanish. Since defendant did not put in a case, Fonseca's testimony remained essentially unrebutted.

We can only speculate whether defendant strategically disguised his bilingualism from the beginning or whether Myriam misunderstood why defendant demanded that she convey directions to Naula. However, the record is clear that at least one disinterested witness recorded defendant's command of English, and that Naula heard defendant speak in both English and Spanish. The court's own observations concerning defendant's reliance on an interpreter are not susceptible to our review. Nevertheless, defendant's failure to stand when directed to do so in English does not lead us to any clear conclusion.

The correlation of defendant's skin tone and ethnic background with that of the perpetrator is well amplified in the record and needs no further elaboration here. Whether or not he seemed to have freckles is not dispositive; we particularly note that seasonal sunlight seemed to have affected his skin tone in photos, and do not find it beyond the realm of possibility that similar factors affected possible freckling. Nor is it clear what Myriam meant by freckles, an ambiguity understandably not explored by the defense.

With regard to facial hair, the arrest photo upon which the court relied to conclude that defendant had a goatee and moustache portrays, to our eyes, only a young man with a few days' growth. Since Myriam was inexact as to the date when

she last saw defendant in January, the court was less than accurate in determining that it was exactly five days, rather than a week or more. In any event, it would not be beyond the realm of the probable that the defendant might have been clean shaven on the one date but could have the limited growth portrayed in the arrest photo after only five days. Nor is it clear that he was "clean shaven"—a conclusion reached by the trial court—when last seen by Myriam. She only failed to notice facial hair; he could just as likely have not shaved for a couple of days by then. Myriam's observations are not inconsistent with the arrest photo, and this was not a sound basis to reject the identifications. Although the trial court disparaged other particulars of Myriam's description of the perpetrator for their purported generality, it is notable, nonetheless, that in no other significant manner was her detailed description inconsistent with defendant's appearance.

Nor do we find a base to invalidate Naula's lineup identification, despite unconventional aspects of the procedure that, in any event, were argued before the jury by counsel. Naula also had ample opportunity to observe defendant while he was in the apartment.

The trial court found these aspects of the evidence, in toto, to fatally undermine the identification evidence. However, in our review, these factual issues were all either explainable or would not detract from the rationality of the verdict to warrant a vacatur of the jury verdict (*People v Echevarria, supra*).

Accordingly, the order of the Supreme Court, New York County (Rena Uviller, J.), entered November 20, 1995, setting aside the verdict convicting defendant of robbery in the first degree and burglary in the first degree, should be reversed, on the law, the verdict reinstated, and the matter remanded for further proceedings.

MILONAS, J. P., RUBIN, ANDRIAS and COLABELLA, JJ., concur.

Order, Supreme Court, New York Court, entered November 20, 1995, reversed, on the law, the verdict reinstated, and the matter remanded for further proceedings.