·(May 18, 2000)

■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JOVANI GARCIA, Respondent. [707 NYS2d 441] —Order, Supreme Court, New York County (Rena Uviller, J.), entered on or about November 20, 1995, granting defendant's motion pursuant to CPL 330.30 (1) to set aside the jury verdict convicting him of robbery in the first degree and burglary in the first degree, unanimously reversed, on the law, the verdict reinstated and the matter remanded for further proceedings.

On a prior appeal, we reversed the order presently under review and reinstated the verdict (237 AD2d 42). On that appeal, defendant, who was at liberty, had not put in any appearance, either *pro se* or by counsel. On the basis that defendant had not affirmatively waived representation by counsel, and that the appeal was heard without representation by counsel, the Court of Appeals reversed our order (93 NY2d 42) and, without addressing the merits of the appellate issues, remanded for an appeal de novo. Counsel has now been assigned. On the basis of counsel's arguments and our examination of the appellate record, we review the issues raised by the People de novo.

Initially, the order being appealed is procedurally defective. CPL 330.30 (1) allows vacatur of the verdict upon "[a]ny ground appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court." The distinction between a weight of the evidence review, not permitted by CPL 330.30 (1), and an analysis of whether the evidence legally supports the crime charged is critical (*see generally, People v Bleakley*, 69 NY2d 490, 494-495;

*People v Malizia,* 62 NY2d 755, 757, *cert denied* 469 US 932). The record would support legal insufficiency in this case only if the trial testimony of the People's witnesses, primarily the young complainant, were totally unworthy of belief (*People v Carthrens,* 171 AD2d 387). Such a conclusion is not supported by this record. Although characterized by the trial court as an order grounded in legal insufficiency of the evidence (*People v Echevarria,* 233 AD2d 200, *lv denied* 89 NY2d 942), equated by appellate counsel with a finding that defendant's guilt was factually impossible, the CPL 330.30 order in this case essentially rested on the trial court's factual review of the weight of the evidence. This respected Trial Judge obviously was troubled by aspects of the evidence, most notably the question whether defendant was conversant in English, the language utilized by the perpetrator. Nevertheless, her review paralleled the same review as that of the jury, which had sat as the finder of fact. This is not a power statutorily extended to the trial court in a jury trial (*People v Goodfriend,* 64 NY2d 695, 697; *People v Echevarria, supra*). Hence, if only for procedural reasons alone, reversal is required.

However, we also undertake a comprehensive review of the record evidence. The trial court articulated the position that factual discrepancies undermined the credibility of the People's case in *toto,* and we broaden the context of our findings accordingly. The basic facts, and the integrity of the young complainant, are not in serious dispute. The issue raised by the trial court, presented to us, and argued extensively before the jury, is whether the defendant was reliably identified.

The chief witness for the prosecution was 14 year old Myriam Cubi. The girl lived with her family, including three younger sisters, one of whom was an infant, her parents and an older family friend, Mario Naula, whom she called an uncle. As her parents waited outside the apartment building on the morning of the offense, she ran back upstairs to retrieve something and first encountered the perpetrator as he left the next door apartment. She entered, then left, her own apartment, and followed defendant down the staircase. The perpetrator momentarily blocked her with his arm; as she got beyond him, she heard him address her in English as "little girl". Parenthetically, the trial court based its CPL 330.30 order in part on a conclusion that defendant did not speak English. During this encounter, the girl made specific observations about his clothing and appearance, and provided approximate height and age, especially describing him as a light-skinned Hispanic, possibly Dominican or Puerto Rican. She remembered that "if you look to him

real close, you'll see that he had like freckles," and that he had a thin face and no facial hair. On appeal, defendant contends that he had facial hair when arrested and no freckles, points discussed *infra*.

The perpetrator directed the girl at gunpoint back to the apartment where, upon entering, he struck the uncle in the head with the gun. In the meantime, the girl ran to a bedroom, concealed her baby sister under blankets and directed the other sisters to remain silent. Upon returning to the front room, the perpetrator, conversing in English, directed her to convey his commands to the uncle, who had not understood the perpetrator's use of English. The girl, in fact, did not recall the perpetrator conversing in Spanish, and his English seemed uninflected.

After tying up the uncle, the perpetrator stole money and jewelry from a drawer and directed her to undress, explaining, after hitting her on the face with the gun, that he wanted to impede her following him. In the meantime, the uncle, having fled to the bedroom where the children were hidden, escaped through a window with one of the girls. The perpetrator, furious, put the gun to the girl's head, and clicked the trigger mechanism, then did the same to the other sister, then threatened to kill them. In a fury, he ran around the apartment. When he stepped outside, the girl promptly locked the door and called 911. During this entire episode, Ms. Cubi had ample opportunity to recognize defendant.

The following day, she viewed photos and selected two, indicating a certainty of "90%." Both photos were of defendant, though at the time she indicated that the perpetrator seemed lighter skinned than the photo depiction. She testified that she was told at the time that the time of year the photo is taken might have an affect on skin tone, and that background light also can appear to darken the subject's skin tone.

The crime had occurred in November. She next saw the perpetrator, in front of her building, on New Year's Eve. In fear, she did not take further action. The following week, though, she saw him again, now standing across the street with companions. When she directed her sister to look, the sister confirmed that he was the perpetrator. Again, she was afraid to take further action.

Detective Blunt arrested defendant on January 11, 1995. When the detective informed defendant that he was under arrest, defendant asked "what," but thereafter did not appear to respond in English. On January 11, lineups were arranged. Detective Blunt recalled that the girl initially was afraid when she viewed the lineup and ran from the room. She then picked

defendant and made a positive identification. Detective Castillo conducted the lineup for the uncle who, though initially appearing normal, became visibly frightened when he saw defendant. After initially stating that he did not recognize anyone and then leaving the room, he told Castillo that he was afraid. After Castillo told him that he should not be afraid, the uncle identified defendant. The uncle in essential part corroborated the girl's testimony, describing the perpetrator as a light-skinned Puerto Rican or Dominican who, though occasionally using Spanish, generally conversed in English.

Defense counsel argued several points forcefully during summation: that the defendant, who used an interpreter during trial, did not speak English, and the perpetrator apparently did not speak Spanish; that the girl described the perpetrator as lighter-skinned than defendant, with freckles, and that his facial hair at the time of the arrest also was inconsistent with her description. Notably, the girl did not remember whether defendant had facial hair at the lineup, and she had last seen the perpetrator only the prior week. The jury convicted defendant as charged. The court, focusing primarily on these linguistic and descriptive discrepancies in the evidence, and noting its own observations in these regards, including what it found to be equivocations in the identifications, concluded that the verdict was not rationally supportable.

In each of these regards, there is a reasonable view of the evidence that supports the verdict. The People called as a witness the employee of the New York City Criminal Justice Agency (identified to the jury only as a city agency) who had interviewed defendant in connection with this case. Although, unsurprisingly, she had no independent memory of defendant, she testified that she inferred from the form that she used for the interview that defendant spoke English. The form requires that a check mark indicate, for purposes of ascertaining the need for an interpreter, whether the interviewee speaks English or an "other" language; she did not check "other." Moreover, a "miscellaneous" box would indicate what "other" language was used; in defendant's case, no other language was mentioned. This meant that the interview was conducted in English. On cross, the employee conceded the possibility of making a mistake in recording pedigree information, but concluded that she would not likely mistake the interviewee's language in this case, insofar as she does not speak Spanish. When the evidence in this case including the interviewer's testimony is considered with the uncle's testimony that the perpetrator seemed to speak some English, and the detective's

testimony that defendant's initial response to him was a common enough English response, where one might otherwise plausibly anticipate a common enough Spanish response, leads us to conclude that the jury, which heard the evidence as well as the argument and had its own opportunity to observe defendant throughout trial, did not act irrationally.

Although the trial court was disturbed by inconsistencies in testimony describing the perpetrator, defendant's appearance in most regards correlated with the testimony. There were two major exceptions, upon which counsel, and the court, focused. Whether or not the perpetrator had "freckles," and what exactly the girl meant by the term—a fact understandably not explored by defense counsel during cross—is not dispositive. The issue of defendant's facial hair also remains ambiguous rather than compelling. The arrest photo depicts a faint goatee and moustache that might suggest only recent growth, and the girl's testimony that she had not noticed facial hair on prior occasions, including the prior week, is not tantamount to evidence that the perpetrator had been clean-shaven at that time. After all, she did not notice whether he had facial hair at the lineup yet, manifestly, he had. Again, we are left only with ambiguities rather than compelling contradictions, ambiguities presented to, and resolved by, the jury. We cannot find that the jury in these regards so departed from reason that the verdict should be vacated. Concur—Sullivan, P. J., Tom, Mazzarelli, Saxe and Friedman, JJ.